EDWARD JOSEPH McGEE, Plaintiff in Error, v.
STATE OF TENNESSEE, Defendant in Error.

451 S.W.2d 709.

Court of Criminal Appeals of Tennessee. Oct. 2, 1969.

Certiorari Denied by Supreme Court March 2, 1970.

Thomas A. Wiseman, Jr., and Thomas M. Hull, Tullahoma, for plaintiff in error.

George F. McCanless, Atty. Gen., Thomas E. Fox, Deputy Atty. Gen., Nashville, James S. Kidd, Dist. Atty. Gen., and Fred B. Hunt, Jr., Asst. Dist. Atty. Gen., Fayetteville, Noel R. Bagwell, Dist. Atty. Gen., Clarksville, Rondal T. Wilson, Special Prosecutor, Shelbyville, for defendant in error.

## OPINION

WALKER, Presiding Judge.

From his conviction of first degree murder of Phyllis Seibers and sentence to 99 years in the penitentiary, the defendant below, Edward Joseph McGee, appeals to this court.

On December 18, 1966, Phyllis Seibers, age eight, and her cousin, Deborah Ray, age nine, went to the Shelbyville city dump to play. They were there sexually

molested and severely beaten by blows on their heads. Although the wounds to her head were sufficient to cause death, Phyllis Seibers actually died from drowning, her body being thrown in a creek by her assailant.

When the girls failed to return home, a large search party attempted to find them. The defendant had been seen in the dump at about the time of their disappearance and he participated in the search. The officers asked him a number of questions about the girls' disappearance before he became a suspect. One of their interviews took place at the city jail. Later he was given warnings and interrogated at the city hall for a rather lengthly period, in which his answers were exculpatory. He says he volunteered to be interrogated at these times and also volunteered to take a polygraph test. He does not object to these interrogations or the taking of the test.

The principal question before us is the admission of his confession on January 24, 1967, to which he does object.

At the time of this incident, the defendant had been convicted of burglary and the question of a suspended sentence was before the court. For reasons not connected with this case, the trial judge declined to suspend the sentence and committed him to the penitentiary on the burglary conviction.

At his own request in the penitentiary, he was transferred to the maximum security unit. He says some prisoners were unfriendly to him because of the charges against him about the girls.

On January 24, 1967, T.B.I. agents Shelton and Coleman interrogated him in the penitentiary. Both testify

that Shelton again gave him the complete *Miranda* warnings and asked if he understood his rights; that he nodded his head and replied, "Yes." The defendant, at the hearing out of the presence of the jury, said that he was given no warning about his right to a lawyer. He also said he was given no warnings at the city hall interrogation to which he did not object.

At this hearing, the trial judge held that he had been properly warned and had waived his constitutional rights and further that the confession was not coerced and was voluntary.

■ There is a direct conflict between the testimony of the defendant and the officers which raises questions of fact as to whether the defendant was warned and waived his rights and whether or not his confession was voluntary. The trial court determined these questions in favor of the State. On review we will not disturb such determination unless against the preponderance of the evidence.

The defendant contends that he could not silently waive his rights. The proof shows that he affirmatively answered by nodding his head and replying, "Yes," when asked if he wanted to talk. He says he must expressly reject counsel to waive his right.

■ ■ Once a defendant has been informed of his rights and indicates that he understands those rights, his choosing to speak and not requesting a lawyer is sufficient evidence that he knows of his rights and chooses not to exercise them. Of course, the attendant facts must show clearly and convincingly that he did relinquish his constitutional rights knowingly, intelligently and voluntarily, but a statement by the defendant to that effect is

not an essential in the chain of proof. See People v. Johnson (Supreme Court of California, 1969), 450 P.2d 865, 874, 75 Cal.Rptr. 401; United States v. Hayes (4th Circuit, 1967), 385 F.2d 375 (1967); State v. Matt (Supreme Court of Oregon, 1968), 444 P.2d 914. The accused here voluntarily and affirmatively waived his right to remain silent and to counsel. The trial judge's finding is well substantiated.

He contends that his confession was coerced. The defendant, age nineteen, has had emotional problems, some connected with sex, and had attended an institution for problem children in Kentucky. He had also been twice confined in Central State Hospital. He was sane at the time of this occurrence. Although he has only a third grade education, his testimony does not show any lack of intelligence.

 In this interrogation, Agent Shelton told him that the polygraph test and the tests of the clothing showed he had been untruthful. Shelton mentioned no specific test of clothing. He was confronted with inconsistencies in his previous interrogations. The officers led him to believe that they knew he was guilty without his confession. Shelton asked him about his belief in God, but this did not amount to coercion.

The defendant says that Shelton threatened him with a club and belt which he took from a drawer; that he told him the lie detector proved his guilt and that his clothes showed blood and that a rock had his fingerprints. He says that the officers put words in his mouth. He admits telling that he beat the girls with a rock and threw them in the creek but he steadfastly denied any sexual molestation of them.

■ The fact that officers misrepresent the evidence they have against an accused, while relevant in viewing the totality of circumstances, is not sufficient in this case to invalidate this otherwise competent confession.

In Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684, the accused was falsely told that his co-defendant had confessed, after which the accused made a full confession. Holding the confession admissible, the court held:

"* * * The fact that the police misrepresented the statements that Rawls had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible. These cases must be decided by viewing the 'totality of the circumstances,' * * *."

In People v. Robinson, 31 A.D.2d 724, 297 N.Y.S.2d 82 (1968), the police deceived the defendant by showing him a false confession of another suspect. The court held that this did not invalidate his subsequent confession.

The defendant further says that the confession was obtained by confronting him with clothing obtained in an illegal search of the defendant's room. The trial judge held the articles obtained inadmissible and they were not presented to the jury. The State excepted to this ruling.

The defendant lived as a member of the family of Mr. and Mrs. William Harold Farrar, to whom he was not related. At the request of the officers, without a search warrant, Mrs. Farrar permitted them to take some of

the defendant's clothing from the room he occupied in the Farrar house.

■ ■ Persons having equal rights to use or occupation of the premises may consent to a search of them and such search will be binding upon the co-occupants. See Lester v. State, 216 Tenn. 615, 393 S.W.2d 288. A joint user has authority to consent to a search. See Frazier v. Cupp, supra. We think that the clothing was not obtained by an illegal search.

All assignments on the admissibility of the confession are overruled.

The defendant says that the court erred in refusing his motion to withdraw his not guilty plea and permit him to file a plea in abatement alleging that the indictment was based on an illegal confession and an unlawful search.

■ ■ On a motion to quash or a plea in abatement, the court will not review the character of the evidence on which the indictment was found. 42 C.J.S. Indictments and Informations § 209. The general rule is that the law does not permit the court to go behind an indictment to inquire into the evidence considered by the grand jury to determine whether it was in whole or in part competent and legal. 41 Am.Jur.2d, Indictments and Informations, Sec. 232. See also 38 C.J.S. Grand Juries § 42.

Moreover, we have now held admissible on trial the evidence to which the defendant objects.

Finally, the defendant says that the trial judge should have declared a mistrial because of an emotional out-

burst by the mother of the victim. He says the trial judge failed to instruct the jury to disregard it.

The trial court said, at page 523 of the bill of exceptions:

> "Before I let you go, I want to state to you that just before the noon recess, we had an occurrence in the Court room, where a member of the audience made some statements in your presence. I'm instructing you to completely disregard anything that the spectator may have said, or you may have heard said—just put that from your mind. It has absolutely no evidentiary value in this case at all. Just disregard it completely."

We think the court was referring to the outburst, about which the defendant complains. In any event, he let the jury know they were not to be influenced by any actions of the spectators. He further emphasized in his instructions that the jury should have no sympathy or prejudice or allow anything but the law and the evidence to influence their verdict. This assignment is, liksewise, overruled.

We find that the verdict of guilty was fully justified by the evidence and that there were no errors on the trial warranting a reversal of the judgment of conviction.

The judgment is affirmed.

This case was heard and submitted to the Court prior to the enactment of Chapter 330 of the Public Acts of 1969 increasing the membership of the Court.

OLIVER, J., concurs.

GALBREATH, Judge (dissenting).

I must respectfully dissent from the opinion of the majority because I find that the record sustains plaintiff in error's allegation that his confession, admitted over objection, should have been excluded from evidence because it was obtained under circumstances denying him his Fifth Amendment right to remain silent, and his Sixth Amendment right to counsel. I find the position of the State that the defendant waived these rights untenable in view of the proof.

The defendant was questioned a number of times prior to his final acknowledgement of guilt and was, according to the officers who conducted the interrogations, advised of his constitutional rights as set out in the case of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, every time he was interviewed after he became a suspect.

On one of the occasions the defendant told the investigating officers some matters that later were found to have been untrue and on the last period of questioning the defendant was confronted with the inconsistencies of his prior statements. He continued to deny any knowledge of this crime for more than an hour while undergoing interrogation from two officers in an isolated room in an atmosphere totally adverse to him in the State Penitentiary in Nashville, where he had been sent following his involvement in this case. He had been previously convicted of burglary and was free at the time this crime was committed while the judge had under advisement an application for a suspended sentence. A few days after the commission of this crime the trial judge denied the application for suspended sentence and it was for this reason the defendant was in the Penitentiary.

Two agents of the Tennessee Bureau of Investigation, William E. Coleman and Kenneth Shelton, went to the Penitentiary on the 24th day of January, 1967, to confront the defendant with information that had recently come into their possession which convinced them the defendant had lied on the said prior occasion. After testifying on the trial of this cause that he was aware of the fact that the nineteen year old defendant had a low I.Q. and was not of a "high mentality" and other factors in the background of the defendant, including confinement at Central State Hospital for the mentally ill, Agent Coleman was asked and replied as follows:

"Q. In spite of all this, you had no necessity to go beyond reading the card—the Miranda card that you carry, to him? Is that right?

A That's correct.

Q *And you felt no necessity to require any affirmative waiver from him, any knowledgeable waiver from him, other than the simple nodding of the head? Is that right?* (Emphasis added)

A Well, that's substantially correct. The subject had recently been in Court, and had had the services of an attorney, and I'm sure was advised by his able attorney what his rights were in that particular case.

Q It has nothing to do with this case, has it, Agent Coleman?

A It has nothing to do with this case. That's right.

Q I believe he was presented by the Honorable Richard Nance?

A Yes, sir.

Q And you have no way of knowing, of course, if the Honorable Richard Nance had any idea of this offense or any further?

A No, sir.

Q And you are not suggesting anything that might have been advised him on his prior representation, had any bearing at all on this case? Are you?

A On this case—no, sir."

Does the above testimony from the State's witness establish a valid waiver in light of *Miranda?*

The nod of the head was apparently interpreted by the interrogator as signifying only an understanding by the defendant of his rights. Indeed the nod was in response to the direct question, "Do you understand what all your rights are?" Even if the nod is construed to mean, "Yes, I do understand what all my rights are," what interpretation should be placed on the continued protestations of innocence and denials of guilt? Do not these actions say just as eloquently as the nod signified an understanding of his rights, "Even though I understand my rights I do not want to tell you what you want to know"? The communication from the defendant we must find in substance in the record before the confession meets the test of admissibility is, "Yes, I do understand what my rights are and I waive these rights." Understanding and waiver are not the same. Perhaps most of the victims of the type of coercion and mistreatment used to obtain confessions condemned by recent decisions of the United States

Supreme Court understood their rights and never waived them, but simply broke down after repeated physical and psychological pressures became too great for further resistance. The defendant here explained on cross-examination the effect the prolonged questioning had on him.

"Q Eddie, one other question: Tell the Court, in your own words, exactly why you confessed?

A Just like I done told you, I was scared into all of it.

Q Scared? Of what?

A Of a beating or something like that.

Q Of a beating, or something like that?

A Yes.

Q Any other reasons?

A No.

Q And you say that Agent Coleman, the only thing he ever said, was, 'Come on, son, it would be better for you in the Hereafter if you would make a clean breast of it?'

A Yes, sir.

Q And didn't you agree with him that it would be better?

A After I had done broke down."

At no point in the record, which I have carefully examined page by page and line by line, does it appear that the defendant ever told anyone he did not want a lawyer. The State's proof is that the defendant did not

say whether or not he wanted an attorney. Thus, except for the nod, we have a completely silent record on this vital point.

"Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver." Miranda v. Arizona, *supra.*

Here we do not have the unequivocal waiver of the type our Supreme Court recently discussed in its unreported decision of January 24, 1969, in the case of Hazel Jackson v. State, in which the defendant stated after being given the necessary advice and warnings, "Yes, I will tell you what happened." Here we have only a nod of the defendant's head followed by more than an hour of continued denial of guilt in the face of what must have seemed to him to be overwhelming evidence in the hands of his interrogators that they knew he was lying.

Knowledge concerning not only the mental attitude of the defendant but that of the interrogators is important to present the totality of circumstances involved to shed light on whether or not the defendant freely and voluntarily waived his privileges. The attitude of the officers is apparent from the following testimony of Agent Coleman:

"Q So the first thing you did, when you got in there and started the interrogation, you say you advised the subject of his Rights, you showed him this lie detector test, and you told him, this polygraph

examination proved you were lying to us—something to that effect—is that correct?

A We also discussed from him here the lab tests that came back from the F.B.I.

Q You told him about the results of the lab tests and you told him that that indicated that he had been lying, too, didn't you?

A Of course, we told him that it indicated that he had been untruthful, that certain transfers of things indicated that he had.

Q In other words, Agent Coleman, the crux—the thrust of your examination, interrogation, of this subject on this occasion was: We know you did it. Here's why we know you did it, because this polygraph test and inconsistencies we have developed from other witnesses, these laboratory tests, now you might as well go ahead and confess—wasn't that the thrust of your examination?

A Well, it was our—when we went out there, certainly, it was our purpose to gain the truth about the matter.

Q I understand, sir. But I'm talking about the thrust of your interrogation, and the manner in which—the psychology of your interrogation, if that's a proper word—was to make the subject believe that you had the goods on him, he might as well go ahead and confess—isn't that correct?

A I would think that is substantially correct—yes sir.

Q In other words, the whole thrust of your examination was: We have got the goods on you, we know you did it, and you might as well confess—isn't that right?

A That would be substantially correct.

The method described above is almost a textbook example of the, "Look, Joe, we know you did it, why not make it easy on everybody, including yourself?" method well known to every law enforcement officer.

Such tactics on the part of the interrogating officers in view of the totally oppressive surroundings in which the defendant found himself, coupled with his continued refusal to admit the truth, raises a strong suggestion that his final, reluctant admission was something less than a product of free will:

> "Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege." Miranda v. Arizona, *supra*.

If the State's contention that the waiver was free and voluntary is correct, it would not have taken seventy minutes of dual interrogating to have elicited from him the statement, "All right, I killed them." To reiterate *Miranda,* such prolonged denial by the defendant is in-

consistent with any notion of a voluntary relinquishment of privilege.

Being bound by the United States Supreme Court's ruling in Miranda v. Arizona, *supra,* I would hold as a matter of law that the State has not carried the "heavy burden" resting on it to show the defendant was afforded the constitutional rights to which he was entitled.