IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

FILED

August 20, 1998

Cecil W. Crowson
Appellate Court Clerk

APRIL 1998 SESSION


STATE OF TENNESSEE,        )

                           )        No. 01-C-01-9706-CC-00219

        Appellee,          )

                           )        Franklin County

v.                         )

                           )        Honorable Buddy D. Perry, Judge

MITCHELL D. ASHLEY,        )

                           )        (Theft of Property; Possession of

        Appellant.         )         a Controlled Substance)


FOR THE APPELLANT:                FOR THE APPELLEE:

Philip A. Condra

District Public Defender

204 Betsy Pack Drive

Jasper, TN  37347

John Knox Walkup

Attorney General & Reporter

425 Fifth Avenue, North

Nashville, TN  37243


Ellen H. Pollack

Assistant Attorney General

425 Fifth Avenue, North

Nashville, TN  37243


James M. Taylor

District Attorney General

265 Third Avenue, Suite 300

Dayton, TN  37321


William B. Copeland

Assistant District Attorney General

Franklin County Courthouse

Winchester, TN  37398

OPINION FILED: _____


AFFIRMED


L. T. LAFFERTY, SPECIAL JUDGE


**OPINION**


The appellant, Mitchell D. Ashley (defendant), was convicted of theft of property, a Class D felony, and possession of a controlled substance, a Class A misdemeanor by a jury of his peers.[1] The trial court found the defendant a standard offender and imposed a Range I sentence of four (4) years in the Department of Correction for the theft conviction and eleven months and twenty-nine days in the county jail for the drug charge. The defendant was also

---

[1]     The jury acquitted the defendant of burglary charges.

fined $2,500. The trial court ordered that the two sentences run concurrently for an effective sentence of four years.

The defendant presents four issues for review. He contends the evidence is insufficient as a matter of law to support the convictions. He also contends the trial court erred (a) by denying his motion to suppress, (b) by instructing the jury on joint and constructive possession of drugs, and (c) by imposing an excessive sentence. After a thorough review of the record, the briefs submitted by the parties, and the law governing the issues presented for review, it is the opinion of this court that the judgment of the trial court should be affirmed.

## I. Facts

In the winter of 1994, Ricky Foster owned and operated Cumberland Valley Concrete in Winchester. On December 12, 1994, he closed for the day as usual around 5 p.m.

When Mr. Foster returned the next morning, he discovered the back door to his business had been pried open and most of his office equipment and supplies were missing.

Among the items stolen were telephones, a copy machine and stand, vacuum cleaners, word processor, bank bags with $1,000 cash and gift certificates, power drills and chargers, tools, microwave, first-aid kit, paper products (towels, napkins, plates), pencils and pens, scratch pads, calculators, mobile radios, cleaning products, an ink stamp with the Cumberland Valley Concrete emblem, and a Christmas poinsettia. He estimated the value of the items at $6,000 not including the cash or gift certificates. His insurance company paid him $2,000 for the theft.

Mr. Foster said he found some smaller items, such as pens and a sewing kit, scattered outside the building. A die set was found about 200 yards from the office toward the defendant's house.

The defendant, Mitchell D. Ashley, lived in a house about 200 or 300 yards away from the concrete company. He lived there with his girlfriend, Lora Hacker.[2] Ashley's house was on the corner of Shephard and Third Streets. The house faced Shephard, and Third Street ran parallel to the side of the house. A driveway off Third Street ran behind the defendant's home. A small porch was located toward the rear of the house on the side opposite Third Street. Third Street provided access to the concrete company.

While leaving the concrete company office on December 14th via Third Street, Mr. Foster passed the defendant's house. Through two windows near the rear porch he saw two vacuum cleaners.[3] Through a window facing Third Street he saw a microwave oven resembling the one taken from his business. His suspicions were raised because he had not seen a microwave there before. Mr. Foster explained that it was dark outside, the windows were not obstructed, and the lights were on inside the house making the items inside visible.

---

[2] At the time of the theft, Lora Hacker was the defendant's girlfriend. She was tried as a co-defendant. While married to the defendant's cousin, Eric Ashley, Hacker moved in with Mitchell Ashley and at the time of sentencing was pregnant with his child.

[3] The defendant challenged Mr. Foster's claim that he could see the vacuum cleaners through windows next to the back porch. The porch was not visible from the area of Third Street directly abutting the defendant's home. Mr. Foster explained that coming from the concrete company Third Street curved. Mr. Foster said the defendant's back porch and windows were visible from the curve in the road. While photographs of the home included in the record show the view obstructed by trees, the victim pointed out that the theft occurred in the winter and the trees did not have leaves.

He drove by the house a second time to verify what he thought he saw. He then called the police station and told Investigator Betsy Green.

On the same day, Investigator Green went to the defendant's home, knocked on the door, and asked Lora Hacker if she could speak with the defendant. At some point while waiting on Ms. Hacker or the defendant to come to the door, Green said she saw through the door and the nearby windows what looked like some of the stolen items sitting on a dresser.[4] They were partially covered with a blanket. She could also see two vacuum cleaners.

She told the defendant why she was there and asked to search his house. He gave verbal consent and then signed a written consent form. Other officers came to assist Green in the search. The defendant cooperated and pointed out various items in the house that were stolen. During the search, Green discovered a tray containing marijuana in a kitchen cabinet.[5]

The defendant told Green he found the items on the side of the road. Green told jurors, "Initially he said that that night they'd made several trips down to the Speedway or I think it's also being referred to as the Amoco station. At one point him and his children went and then at one point him and Mrs. Hacker went." He said the items were stacked up in two locations. He said he did not know the concrete company office had been burglarized. He told Green there were two or three people that seemed to be moving stuff out of the office and piling it up outside.

---

[4]   Green testified during the motion to suppress that she noticed the items after the initial knock and while waiting for Lora Hacker to come to the door. At trial, she testified that she noticed the items after knocking, speaking with Lora Hacker and while waiting on the defendant to come to the door.

[5]   A forensic chemist from the Tennessee Bureau of Investigations testified that the material recovered was marijuana weighing .13 grams. He said the marijuana was "just enough to test."

Green said some of the gift certificates taken from the office were later found in a grocery store parking lot and some at a laundromat.   The money was never recovered.

Mr. Foster testified at trial he often saw the defendant and Lora Hacker walk across his property to a convenience store. The day after the burglary the pair altered their normal route and walked around the lot to the store.

Dennis Burns, who lived next door to the defendant, testified he saw the defendant, Hacker, and two children walking around the concrete company's office building about 7 p.m. on December 12th.

Burns acknowledged that he often saw the defendant, Hacker, and two children walking across the property on their way to several convenience stores nearby because they did not have a car. However, Burns said on this night they were walking around the building as opposed to walking past it.

The next morning Burns found a typewriter in his yard.

Justin Ashley, the 10-year-old son of Lora Hacker,[6] said on the night of December 12th his mother and the defendant told the children they were going to a convenience store. The children were told to stay inside. Justin said he went outside to pet their puppies and saw two dark figures resembling his mother and the defendant  coming out of the concrete office. He went back inside the house.

---

[6]     Justin is the son of Lora Hacker and Eric Ashley, the defendant's cousin.

On cross-examination, Justin acknowledged that he initially told Investigator Green that he followed his mother and the defendant halfway to the concrete company.[7] Justin told Green that the defendant had what looked like a $20 bill sticking out of his pocket.

After the couple's arrest, Justin said the defendant told him he did not need to testify in this case.

Neither the defendant nor his co-defendant took the stand.

## II. Sufficiency of the Evidence

The defendant contends the evidence is insufficient as a matter of law to support a conviction of theft (over $1,000 and less than $10,000) and a conviction of marijuana possession. As to the theft conviction, the defendant objected to the victim's identification of the stolen items through the use of photographs instead of the actual property. He argues there was "insufficient identity" of the stolen items and adequate proof was lacking as to value. The defendant also complains that a fatal variance existed between the victim listed in the indictment and the proof at trial.

### A. Applicable Law

---

[7] Defense attorneys attacked Justin's credibility by eliciting testimony that Justin had been to talk to Investigator Green three or four times and that it had been his father's idea. Attorneys tried to suggest Eric Ashley influenced his son's testimony against Mitchell Ashley. Using information from an earlier statement, the attorney for Lora Hacker asked Justin if he remembered seeing men at the concrete company stacking things on the side of the road. Justin replied: "I think so."

When an accused challenges the sufficiency of the convicting evidence, this court must review the record to determine if the evidence adduced at trial is sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App.), per. app. denied (Tenn. 1990).

In determining the sufficiency of the convicting evidence, this court does not reweigh or reevaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App.), per. app. denied (Tenn. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859, cert. denied, 352 U.S. 845, 77 S.Ct. 39, 1 L.Ed.2d 49 (1956). To the contrary, this court is required to afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not this court. Cabbage, 571 S.W.2d at 835. In State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973), our Supreme Court said: "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."

Since a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused, as the appellant, has the burden in this court of illustrating why the evidence is insufficient to support the verdicts returned by the trier of fact. State v.

Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the facts contained in the record are insufficient, as a matter of law, for a rational trier of fact to find that the accused is guilty beyond a reasonable doubt. Tuggle, 639 S.W.2d at 914.

## B. Possession of Marijuana

The defendant contends there was no proof that he actually or knowingly possessed the marijuana. Furthermore, he argues there was insufficient proof that he constructively possessed the marijuana or that he was in a position to exercise control over "what was no more than crumbs." The proof failed to demonstrate that he placed the tray and marijuana in the cabinet under the kitchen sink.

To convict the defendant of this charge, the state was required to prove the defendant knowingly possessed marijuana. Tenn. Code Ann. § 39-17-418. Possession of a controlled substance can be based on either actual or constructive possession. State v. Brown, 915 S.W.2d 3, 7 (Tenn. Crim. App. 1995); State v. Brown, 823 S.W.2d 576, 579 (Tenn. Crim. App. 1991). Constructive possession may be proven by demonstrating that a defendant has the power and intention to exercise dominion and control over the controlled substance either directly or through others. Brown, 915 S.W.2d at 7; Brown, 823 S.W.2d at 579. Constructive possession is the ability to reduce an object to actual possession. Brown, 915 S.W.2d at 7; Brown, 823 S.W.2d at 579.

Having possession of the premises where contraband is found creates an inference that the possessor had possession of the contraband. Armstrong v. State, 548 S.W.2d 334, 336 (Tenn. Crim. App 1976), cert. denied (Tenn. 1977). During the consensual search,

Investigator Green looked in cabinets under the kitchen counter. There she found a coca-cola tray with marijuana.[8] This marijuana was found in the defendant's home that he shared with his family. It is irrelevant that his girlfriend was not charged or that Investigator Green did not ask him about the marijuana when she found it. The drugs, albeit a small amount, were found in the defendant's home; he could reduce the drugs to possession at any time.

The defendant cites Perry v. State, 527 S.W.2d 749, 751 (Tenn. Crim. App. 1975) for support of his argument. In Perry, a panel of this court said the discovery of marijuana in a common room and in the defendant's bedroom in an apartment rented by the defendant was sufficient to sustain the conviction despite testimony from other co-defendants that they were responsible for the marijuana. This case is similar to Perry in that the defendant could reduce the drugs to his possession at any time.

The defendant also relies on Whited v. State, 483 S.W.2d 594, 596 (Tenn. Crim. App. 1972), but his reliance is misplaced. Whited involved the presence of drugs at a business, not a residence as in this case. Authorities found the drugs while executing a search warrant on a business and living quarters owned by one Mr. Lame. Whited testified that he saw someone hide the drugs. In Whited, a panel of this court said "without further proof of the defendant's complicity as to the possession and control of drugs, we cannot agree with holding that this employee [Whited] had the requisite possession of the drugs located on his employer's premises." Whited, 483 S.W.2d at 596.

---

[8] An officer from the Tennessee Bureau of Investigations said the amount measured .13 grams. He also received the butt of a hand-rolled marijuana cigarette; however, it was too small to test.

11

In this case, the marijuana was found in the defendant's home. He could reduce the drugs to his actual possession at any time. These facts constitute sufficient proof from which the jury could reasonably infer that the defendant possessed the marijuana.

## C. Theft

Before an accused can be convicted of theft, the state must prove beyond a reasonable doubt (a) the accused knowingly, (b) obtained or exercised control over the property of another, (c) with the intent to deprive the owner of the property, and (d) without the owner's effective consent. Tenn. Code Ann. § 39-14-103. In this case, the indictment alleged the defendant:

> did knowingly obtain control of and exercise control over: two (2) vacuum cleaners, various cleaning materials, business supplies marked "Cumberland Valley Concrete", bank bags, Smith Corona word processor, Cannon copier and cabinet, telephones, Makita tools and assorted other items[9] being the personal goods and property of: Ricky Foster d/b/a/ Cumberland Valley Concrete without the owner's effective consent and with the intent to deprive the true owner thereof . . . .

The defendant makes several arguments that address the identification of the stolen objects. He first objects to the state's use of photographs of the stolen items at trial rather than using the actual items. The defendant contends that the victim was not able to show that the items in the photographs were unique to Cumberland Valley Concrete. Additionally, the defendant argues that the state failed to prove that the items taken from the office were the same items found in the defendant's home.

---

[9] The trial judge said the phrase "assorted items" in the indictment was broad enough to include items not specifically mentioned in the indictment including the microwave, gift certificates, and other property.

12

The defendant also contends the indictment failed to list specifically all of the items taken such as the microwave, the gift certificate, and the poinsettia.

The defendant also argues that testimony as to the value of the items was lacking. The victim's opinion testimony as to the value of the goods was given without foundation.

Finally, the defendant claims a fatal variance existed between the victim listed in the indictment and the proof of ownership at trial. The variance coupled with the use of the photographs and the statement of opinion as to value "combined to deprive the Appellant of substantial rights."

## 1. Variance

The defendant contends that a fatal variance existed between the victim listed in the indictment and the proof of ownership at trial. The indictment detailed "the personal goods and property of: Ricky Foster, d/b/a/ Cumberland Valley Concrete." At trial. Mr. Foster testified that the property belonged to Cumberland Valley Concrete, a corporation of which Mr. Foster is sole shareholder and president.

The defendant describes this as "the most glaring flaw in the State's proof." Yet, the defendant acknowledges in State v. Moss, 662 S.W.2d 590 (Tenn. 1984), the Tennessee Supreme Court relaxed the rule requiring proof of ownership as an element of the case.

In Moss, the indictment described the victims as two owners operating as a partnership but the proof at trial indicated the owners operated as a corporation. The supreme court said this was not a material variance and constituted "nothing more than harmless error." The court explained that the earlier common law rule requiring strict conformity between the allegations

and the proof had been relaxed "so that substance rather than form is now determinative of such question." Moss, 662 S.W.2d at 592.

This issue is without merit.

## 2. Use of Photographs

The defendant objects to the state's use of photographs showing the stolen items. Instead, the actual recovered items should have been used at trial.

On the afternoon before the trial began, the defendant served the victim with a subpoena duces tecum ordering the victim to bring the actual items into court. The victim failed to bring the items on the first day of trial. The defendant objected to the state's use of photographs of the items. The trial judge refused to require the victim to bring the items into court because of the last minute nature of the defendant's request.

As a general rule, there is no requirement that stolen chattels be introduced as exhibits into evidence. Wallis v. State, 546 S.W.2d 244, 249 (1976), cert. denied (Tenn. 1977); State v. Bernard Woodard, Sevier County No. 03-C-01-9204-CR-129, 1993 WL 20123 (Tenn. Crim. App., Knoxville, Feb. 2, 1993), per. app. denied (Tenn. June 7, 1993).

The issue is without merit.

## 3.  Value

The defendant contends that the proof offered as to value of the stolen items had no foundation.

The indictment charged the defendant with theft of goods valued between $1,000 and $10,000. Mr. Foster valued the stolen items, not including the cash or gift certificates, at $6,000. Mr. Foster told jurors that his insurance company paid him $2,000 for the loss but that amount did not cover the stolen cash or gift certificates. Jurors were instructed to fix the value of the stolen property at $500 or less, more than $500 and less than $1,000, or more than $1,000 and less than $10,000.

By their verdict, jurors found the latter. From all the evidence, a jury could reasonably infer that the value of the property taken was between $1,000 and $10,000. A trier of fact may, from all of the evidence presented at trial, determine the fair market value of the stolen property. State v. Hamm, 611 S.W.2d 826, 828-29 (Tenn. 1981).

The issue is without merit.

## 4. Identification

The defendant contends that the victim was not able to show that the items in the photographs were unique to Cumberland Valley Concrete.

After the stolen property was found, some of it was photographed at the defendant's house. Once it was taken to the police station, it was identified by Mr. Foster. Some of the property was photographed at the station. The property was then returned to Mr. Foster.

Using the photographs, Mr. Foster identified the stolen property as a calculator, two phones, a copy machine and cabinet, microwave, paper towels, vacuum cleaners, scratch pads, napkins, paper products, poinsettia, first-aid kit, pencil sharpener, an ink stamp for Cumberland Valley Concrete, Makita tools, spray nozzles, and bank bags that had contained cash and gift certificates. He said there were many small items that were not included in the photographs, but that he identified at the station. Those included: stamps, a flashlight, cleaning products, small tool kits, and a wall clock.

A jury could reasonably infer that the presence of an ink stamp for Cumberland Valley Concrete in the defendant's home, along with other items resembling those stolen from the concrete company's office, came from the concrete company's office. The testimony from Investigator Green also indicated that the defendant attempted to hide the property by covering it with a blanket. His attempt to conceal the property indicates he knew it was stolen.

The evidence contained in the record is more than sufficient to support a finding by a rational trier of fact that the defendant was guilty of theft and possession of marijuana beyond a reasonable doubt. Tenn. R. App. 13(e); Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

The issue is without merit.

### III.  Motion to Suppress

The defendant contends the evidence seized from his home and the statements he made to authorities should have been suppressed because of an unlawful search and seizure. To the state's contention that the search of the defendant's home was consensual, the defendant

argues Investigator Green obtained consent only after an illegal search. Investigator Green had no lawful right to enter the defendant's property. The defendant argues Investigator Green went to the back door of the defendant's home for the sole purpose of conducting a search because Mr. Foster told her that was where he had seen the stolen property.[10] "Obtaining the Appellant's signature on a permission to search form was. . . no more and no less than a ruse to cover for the unlawful intrusion and warrantless search already committed."

The defendant seeks a reversal and order for new trial.

## A. Suppression Hearing

At the January 9, 1996 suppression hearing, the following facts were established. Investigator Green received a telephone call from Mr. Ricky Foster, the president of the concrete company, on December 14, 1994. The defendant's home is within the same block as the concrete company. The defendant's home is accessible by either North Shephard or Third Street. Third Street provides access to the concrete company. Green went to the

---

[10]    The defendant argues: "Officer Green's admission at trial of her true reason for going to the rear of the house operates to bar the State from relying upon consent." The defendant claims that Green concealed the reason she went to the back door of the defendant's home at the suppression hearing and then at trial revealed it was because of the information she had from Mr. Foster.

The record simply does not support the allegations of the defendant. At the suppression hearing, during redirect examination of Investigator Green, she testified she went to the rear of the home via Third Street because Mr. Foster said he had seen what he thought was his property. She made no secret about her reasons for going to the back door as opposed to the front door.

defendant's home at 119 North Shephard Street. She entered the property via a driveway off Third Street. The driveway ends at the defendant's back porch.

Green said she went to the rear door and knocked. While she was waiting for an answer at the door,[11] she noticed through two windows adjacent to the door several items (typewriters and calculators) partially covered with a blanket that matched the description of the stolen property. She also saw two or three vacuum cleaners.

When Ms. Hacker (the defendant's girlfriend) came to the door, Green identified herself and asked to see the defendant. Ms. Hacker shut the door. A few minutes later, the defendant came to the door. Green identified herself again and told him she was investigating the theft at the concrete company. "I told him about the information we had received regarding the property and asked for permission to search and he gave it." He first gave it verbally and then once inside the house, he signed a written consent to search form. She reviewed the contents of the form with the defendant which included the right to refuse consent. She then called for assistance from other officers. As officers searched the home, the defendant assisted by pointing out various items that had been taken from the concrete company.

At the suppression hearing, defense counsel tried to attack Green's lawful presence at the home. Green said she did not demand access to the house; she did not tell the defendant she was coming in; and she did not tell the family that she would make them stand in the yard until she obtained a search warrant. She did tell the defendant that she had seen the items through the windows. She said she had not conducted what she would term "a search." She explained

---

[11]    Green testified during the motion to suppress that she noticed the items after the initial knock and while waiting for Lora Hacker to come to the door. At trial, she testified that she noticed the items after knocking, speaking with Lora Hacker, and while waiting on the defendant to come to the door.

on redirect examination that she went to the back door of the house because Mr. Foster said he had seen the items there.

Sgt. Danny Mantooth testified that when he arrived at the home, Investigator Green was explaining the consent to search form to the defendant. He described the defendant as "passive" and said he assisted in the search.

The defendant presented testimony from his 15-year-old daughter, Mandy Ashley. Miss Ashley testified she heard a female officer tell her father the police could enter the home without a warrant and if the defendant did not allow it, she would force the family to wait outside while she obtained one. She said that her father insisted he did not commit the crime.

The trial judge asked the teen if she saw who brought the items into the house. She first said she did not remember, and then said she did not see who it was. She also said she did not remember how long the items had been there.

The trial judge denied the motion to suppress. He did not make any findings of fact on the record.

## B. Applicable Law

The standard of review for reviewing a trial court's denial of a suppression motion is whether the evidence preponderates against the trial court's findings. State v. Odom, 928 S.W.2d 18, 22-23 (Tenn. 1996). The "party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. The credibility of witnesses, the weight of the evidence, and the resolution of conflicts in the evidence are all matters entrusted to the trial judge as the trier of fact. Id. Thus,

the factual findings of the trial court in suppression hearings are presumptively correct on appeal and will be upheld unless the evidence preponderates against them. Id., State v. Woods, 806 S.W.2d 205, 208 (Tenn. Crim. App. 1990), cert. denied, 502 U.S. 1079, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992): see also State v. Tate, 615 S.W.2d 161, 162 (Tenn. Crim. App.), per. app. denied (Tenn. 1981).

A warrantless search is presumed to be illegal under the Fourth Amendment. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). There are, of course, exceptions to the warrant requirement including consent to search. Woods, 806 S.W.2d at 209; State v. Green, 613 S.W.2d 229, 232 (Tenn. Crim. App. 1980), per. app. denied (Tenn. 1981); McGee v. State, 2 Tenn. Crim. App. 100, 107, 451 S.W.2d 709, 712 (Tenn. Crim. App. 1969). The state bears the burden of establishing that the search and seizure were reasonable. State v. Crabtree, 655 S.W.2d 173, 179 (Tenn. Crim. App. 1983).

The Tennessee Supreme Court has said, "In order to pass constitutional muster, consent to search must be unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." State v. Brown, 836 S.W.2d 530, 547 (Tenn. 1992) (citing Liming v. State, 220 Tenn. 371, 417 S.W.2d 769 (1967)). See also Schneckloth, 412 U.S. at 248-49, 93 S.Ct. at 2059, 36 L.Ed.2d 854.

This court has observed that one does not have an expectation of privacy "in front of his residence which leads from the public way to the front door." State v. Baker, 625 S.W.2d 724, 727 (Tenn. Crim. App. 1981). "The custom of expecting people to come to the front door of a residence for various lawful purposes is of long duration." Id. at 727. In Baker, an officer went to the front door of a home to ask for directions to a nearby farm. While at the front door, he observed a marijuana plant in the yard. That observation became the basis for a search warrant.

20

In State v. Gary Raines, et. al, Cheatham County No. 01-C-01-9703-CC-00108, 1998 WL 96420 (Tenn. Crim. App., Nashville, March 5, 1998), this court said a law enforcement officer has a right to knock on the front door to ask about the whereabouts of an individual listed in an arrest warrant.[12]

In this case, the defendant's home was accessible by two streets. Investigator Green, using Third Street that provides access to the concrete company, drove into the defendant's driveway which ended at the back porch. It was not unreasonable that an individual who entered a driveway would use the door closest to the drive. Investigator Green went to the defendant's house to ask him for consent to search the premises. Only after she was there and after she knocked did she notice the suspicious property covered by the blanket.

The facts support the trial court's findings of voluntary consent. The defendant gave oral consent and then written consent. He assisted authorities by pointing out various items that were taken. The consent form signed by the defendant explicitly states that he had a right to refuse consent. See Schneckloth, 412 U.S. at 249, 93 S.Ct. at 2059 (knowledge of right to refuse is a factor when determining the voluntariness of consent). There was no evidence that the defendant asked Investigator Green or her fellow officers to leave.

---

[12]    In Raines while the deputy was at the door asking about an individual named in a warrant, he smelled marijuana coming from the home. State v. Gary Raines, et. al, Cheatham County No. 01-C-01-9703-CC-00108 (Tenn. Crim. App., Nashville, March 5, 1998). Deputies are allowed to "take note of anything evident to their senses so long as they have a right to be where they are and do not resort to extraordinary means to make the observation." Raines, supra, (citing State v. Hurley, 876 S.W.2d 57, 67 (Tenn. 1993)). The Raines court said the deputy did not resort to extraordinary measures by simply knocking on the door.

21

Her presence there was not unlawful. We cannot conclude that the consent was preceded by an illegal search.

As to the defendant's claims that the investigator coerced the search, the trial judge obviously accredited the testimony of the state's witnesses and rejected the version of events as testified to by the defendant's daughter. The trial judge was in a far better position to evaluate credibility than we are. From our view, we can only conclude that the evidence does not preponderate against the trial court's findings. In the case before us, the trial court obviously found the defendant voluntarily consented to the search of his home. See also State v. James R. Wicks, Dickson County No. 01-C-01-9603-CC-00091 (Tenn. Crim. App., Nashville, February 28, 1997) (This court upheld trial court's denial of motion to suppress after finding that the evidence did not demonstrate that consent to search was preceded by an illegal search).

The trial court did not err in denying the defendant's motion to suppress.

## IV. Jury Instruction

The defendant also contends that the trial court erred by instructing the jury on constructive and joint possession of the marijuana.[13] He argues there was insufficient proof that he constructively possessed the drugs, thus, the instruction was not justified. As for the instruction on joint possession, he essentially claims since he was the only one charged with possession, it was error to give the jury an instruction on joint possession. In this case, the co-defendant Lora Hacker was not charged with possession of marijuana.

---

[13] The defendant raised this issue in conjunction with his challenge to the sufficiency of the evidence as to marijuana possession. This court will consider the issue separately.

22

Constructive possession requires that a person knowingly have the power and the intention at a given time to exercise dominion and control over an object either directly or through others. Constructive possession is the ability to reduce an object to actual possession. See State v. Williams, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981). As this court explained in Armstrong v. State, a person with a possessory interest in the residence where drugs are located may be presumed to possess the drugs. Armstrong, 548 S.W.2d 337 (Tenn. Crim. App. 1976). As the state points out, the ownership of the drugs is a question of fact for the jury. Thus the instruction on constructive possession was not in error.

Marijuana was discovered in the house shared by the defendant and his co-defendant girlfriend. The defendant cites no authority to support his contention that in order to instruct the jury about joint possession, more than one person must be indicted for the possession of drugs.

The trial judge must instruct the jury fully on all issues fairly raised by the proof. State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986), cert. denied, 476 U.S. 1153, 106 S.Ct. 2261, 90 L.Ed.2d 705 (1986). The trial judge did so in this case.

The issue is without merit.

## V. Sentencing

As his final issue, the defendant complains that his four-year sentence was excessive. He argues that the trial court erred (a) by failing to consider a mitigating factor and (b) in weighing the mitigating and enhancing factors to arrive at the four-year sentence.

23

## A. Applicable Law

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. § § 40-35-102, -103, and -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

## B. Enhancement Factor

The presentence report established that the defendant, age 37 at the time of the sentencing, completed the twelfth grade. Divorced, he has three daughters and was expecting another child with his co-defendant at the time of sentencing in 1996. The defendant had worked as a carpenter and lathe operator. During the latter job he was injured. At the time of the offense, he was a driver for the Franklin Publishing Company. His prior criminal history

includes convictions for aggravated assault, assault and battery, possession of marijuana, passing worthless checks, hunting without permission, two counts of careless driving, seven counts of speeding, running a stop sign, driving with a revoked license, two counts of driving without proper vehicle registration, violation of boat registration, and two counts of violating the legal bumper height. The defendant's convictions occurred in Franklin, Tennessee and in Bay County, Florida. The defendant admitted to moderate marijuana use.

The trial court found the following enhancement factors:

> (1)    The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. Tenn. Code Ann. § 40-35-114(1).

> (8)    The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community. Tenn. Code Ann. § 40-35-114 (8).

> (13) The felony was committed while on any of the following forms of release status if such release status is from a prior felony conviction:

>> (A) Bail, if the defendant is ultimately convicted of such prior felony;
>> (B) Parole;
>> (C) Probation;
>> (D) Work release; or
>> (E) Any other type of release into the community under the direct or indirect supervision of the department of correction or local governmental authority. Tenn. Code Ann. § 40-35-114(13).

The trial court found no mitigating factors.

The defendant does not object to the use of enhancing factors (1) and (13) but does object to the use of factor (8). Regarding factor (8) the trial judge said:

> I find . . . that the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community. I'm basing that decision upon the fact that Mrs. Ledsinger testified to me that in her judgment this defendant had not cooperated with her on probation, that he, despite her instructions, had gone to the state of Alabama and I'm concluding that it is reasonable to infer that if your automobile is stolen in Alabama there was a pretty good probability you were down there with the automobile when it was stolen, and quite frankly, I'm basing that on my judgment of the credibility and of the defendant, having observed him during the testimony of the trial, and I just didn't believe for a minute, folks, that this property was just set out for somebody to walk by and just happen to take home with them. I understand the jury didn't convict of burglary, but that doesn't necessarily mean that a burglary didn't occur in the situation.

The defendant objects to the trial judge's reliance on the defendant's non-verbal conduct at trial as a means for judging his credibility. The defendant did not take the stand and the trial judge did not explain or elaborate on what non-verbal conduct was observed.

Even if the trial court's reliance on the defendant's unexplained conduct at trial was improper, the testimony of Ms. Janet Ledsinger alone regarding the defendant's actions supports the use of factor (8).

Ms. Ledsinger supervised the defendant's probation sentence in Tennessee which originated in Florida. Although initially complying with the terms of his probation, the defendant ultimately failed to pay fines, to pay cost of supervision, and to report as scheduled to Ms. Ledsinger. The defendant began traveling to North Alabama to visit his cousin's wife, the co-defendant. When Ms. Ledsinger said he could no longer go, he continued. Her testimony indicated that the defendant lied about his relationship with his cousin's wife and lied about travelling to visit her.

Ms. Ledsinger's testimony supports the use of factor (8).

## C. Mitigating Factor

26

The defendant argues now on appeal that the court should have taken into account that the defendant's actions neither caused nor threatened serious bodily injury. Tenn. Code Ann. § 40-35-113(1). The defendant did not ask for the application of any mitigating factors at sentencing. Even if this factor were to mitigate the punishment, the effect would be substantially outweighed by the enhancing factors. Any error would be harmless. State v. David McClure, Davidson County No. 01-C-01-9505-CR-00145, 1997 WL 211254 (Tenn. Crim. App., Nashville, April 30, 1997).

## D. Range of Sentence

Finally, the defendant argues that the maximum sentence of four years was excessive and asks for a sentence of three years.

The defendant was eligible for a sentence ranging from two to four years. Tenn. Code Ann. § 40-35-112(a)(4). The statute provides that for a Class D felony the judge start at the minimum of the range and if there are enhancement factors, and no mitigating factors, then the court may set the sentence above the minimum but still within the range. Tenn. Code Ann. § 40-35-210. The trial judge did not err in sentencing the defendant to the maximum within the range.

The issue is without merit.

_____
L. T. LAFFERTY, SPECIAL JUDGE

CONCUR:


_____
GARY R. WADE, PRESIDING JUDGE


_____
THOMAS T. WOODALL, JUDGE