STATE of Tennessee

v.

James H. SAINT, Jr.

Court of Criminal Appeals of Tennessee, at Nashville.

Assigned on Briefs at Jackson
Feb. 5, 2008.

Sept. 9, 2008.

Application for Permission to Appeal Denied by Supreme Court
Feb. 17, 2009.

Ross E. Alderman, District Public Defender, and Emma Rae Tennent (on appeal) and J. Michael Engle and Willow Fort (at trial), Assistant Public Defenders, for the appellant, James H. Saint, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth B. Marney, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Brian Keith Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

The defendant, James H. Saint, Jr., appeals his convictions of six counts of aggravated sexual battery, a Class B felony.

He was sentenced to eleven years for each conviction, to be served consecutively, for an effective sentence of sixty-six years. On appeal, he claims (1) that the trial court erred in denying his motion to suppress, and (2) that the trial court erred in determining the length of his individual sentences and in imposing consecutive sentences. We affirm the defendant's convictions but reverse the sentences and remand the case for a new sentencing hearing.

The defendant's convictions relate to inappropriate touching of his daughter on various occasions between January 2000 and September 2004, during which time the victim was between four and eight years of age. At trial, the state's evidence included the victim's testimony regarding the incidents and the defendant's videotaped statements, in which he initially denied inappropriate contact, then said he did not remember it, but later admitted having the victim lie on top of him when he was lying in her bed for a bedtime "prayer session" and touching her. The defendant admitted that he would become slightly aroused and stated that he wanted to touch and hug the victim more and wanted to show his love for the victim. He also admitted that the victim had touched his genitals. The defendant testified at trial that he did not intentionally touch the victim. He said he had attempted to explain during the last interview that he might have rolled over to hug his daughter and accidentally touched her. He claimed he had no memory of touching the victim, but he acknowledged it might have occurred. He admitted he assisted the victim with bathing and undressing when she requested help, but he denied the victim's allegation that he had fondled her while she was bathing. He said a note he wrote to the victim during the third interview in which he apologized to the victim was an apology for accidental, not intentional, touching and for the family's financial difficulties.

The jury found the defendant guilty of six counts of aggravated sexual battery. The trial court imposed eleven-year sentences for each conviction as a Violent Offender and ordered that each be served consecutively, for an effective sentence of sixty-six years. The defendant filed this appeal.

## I

On appeal, the defendant contends the trial court erred in denying his motion to suppress his third statement to the authorities, arguing that it was the product of psychological coercion via persistent biblical references and appeals to the defendant's religious beliefs. The state responds that the trial court correctly rejected the defendant's claim that the statement was coerced and involuntary.

On review, an appellate court may consider the evidence adduced at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. *State v. Henning*, 975 S.W.2d 290, 297–99 (Tenn.1998). A trial court's factual findings in a motion to suppress hearing are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn.1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim.App.1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn.2001). The application of the law to

the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. *State v. Yeargan,* 958 S.W.2d 626, 629 (Tenn.1997).

 "The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith,* 933 S.W.2d 450, 455 (Tenn.1996) (citing *State v. Stephenson,* 878 S.W.2d 530, 544 (Tenn.1994)); *see State v. Marco M. Northern,* 262 S.W.3d 741 (Tenn., 2008). For a confession to be considered voluntary, it must not be the product of " 'any sort of threats or violence, ... any direct or implied promises, however slight, nor by the exertion of any improper influence.' " *State v. Smith,* 42 S.W.3d 101, 109 (Tenn.Crim.App.2000) (quoting *Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897)). The essential question therefore is " 'whether the behavior of the [s]tate's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined....' " *State v. Kelly,* 603 S.W.2d 726, 728 (1980) (quoting *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961)). The Supreme Court has held that in order for a confession to be involuntary, it must be the product of coercive state action. *See, e.g., Colorado v. Connelly,* 479 U.S. 157, 163–64, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986).

The record reflects that the defendant was questioned by the police three times, in October 2004, March 2005, and April 2005. During the first two interviews, the defendant denied any sexual misconduct with his daughter. He said during the first interview that he sometimes assisted his daughter with bathing in the evenings and would afterwards lie down, hug, and

hold hands with her. The defendant said he sometimes fell asleep and that the touching might have occurred while he was asleep, although he did not remember it. In the second interview, he again denied any inappropriate contact with his daughter. He said that if he ever touched her, it was when he was asleep or when they were play wrestling. The defendant stated that he attended church regularly and did not believe in having contact of a sexual nature with children.

The third interview lasted approximately two and one-half hours and was conducted by two detectives. The third interview took place at the police station, although the defendant arrived voluntarily and was told he was free to leave at any time. A videotape of the interview is part of the record. The detectives included in their discussion with the defendant references to the Bible, their religious beliefs, and the defendant's religion. These references were interspersed in their discussion of: the victim's allegations; the need for the defendant to admit and to take responsibility for his actions, both for the victim's and his own benefit; the detectives' disbelief of the defendant's previous statement that he did not remember touching the victim; and their urgings to the defendant to be forthcoming.

The detectives' religious references in the interview were as follows: (1) asking the defendant whether he was a Christian man; (2) they believed the defendant was a Christian whose beliefs had eroded; (3) the defendant's use of pornography was like that of Jimmy Swaggart and that of a person who attended church with one of the detectives; (4) the Bible was full of examples of men who slipped and were redeemed by admitting their wrongdoing and asking for forgiveness; (5) the Sermon on the Mount, in which Jesus instructed that before making an offering to God, a

person should settle any grievances with other individuals; (6) people are God's servants, and they were there as servants and not to decide what would happen in the case; (7) the Biblical story of Sampson, a powerful man whose downfall was temptation for women, but who was redeemed and regained his power; (8) they were sure the victim prayed for the defendant not to touch her; (9) the Lord did not believe the defendant's story that he was asleep when he touched the victim; (10) the defendant needed to admit his wrongs because the victim needed to know that what had been preached to her was true; (11) the defendant could pray all day long, but God wanted him to do the right thing; (12) the defendant needed to get right with himself, God, and the victim; (13) the defendant had not decided to "walk on the faith" yet; (14) the defendant had been a good Christian man until pornography had eroded his mentality; (15) sexual desire is God-given; (16) Jesus talked about expelling a demon and seven more demons returning to take up residence—the defendant had been controlled by a demon when he touched his daughter; (17) all things are given by God, but excess brings about sin; (18) the Devil finds things to exploit in our lives, but God does the opposite; (19) demons had destroyed the defendant's life and his family relationship; and (20) one of the detectives had a man come in for an interview who had a Bible with him that he was working back and forth anxiously, and after the man admitted what he had done, he felt much better.

Approximately one hour into the interview, the defendant began acknowledging misconduct with the victim, although he claimed to have no memory of it. At this point, the detectives had made about half of the religious references. The detectives continued prodding the defendant to admit what he had done. After about thirty more minutes of discussion that included religious references, the defendant began to admit in piecemeal fashion his inappropriate touching of the victim. The defendant continued to provide detail, without further substantial religious references by the detectives, and agreed to a summary of his admissions recounted by one of the detectives. He then agreed to write a letter to the victim and asked questions about what would happen next. He was allowed to leave at the conclusion of the interview.

Detective Kevin Cooley testified at the suppression hearing that he and Detective Carrigan conducted the third interview of the defendant. He said the previous two interviews had yielded no admissions and that he "was out of techniques" going into the third interview.[1] He said that prior to conducting the third interview, he knew several things about the defendant, including that the defendant had worked as a laborer at the Law Enforcement Training Academy for many years before becoming disabled, that the defendant was having marital troubles, that the defendant attended a Southern Baptist church, that the defendant had considered suicide recently, and that the defendant and his family were experiencing financial difficulties. He said that he usually did not talk about religion in interviews with suspects, but in this case, the detectives decided to do so because the allegation was that the defendant had sexually abused his daughter while praying and lying in bed with her. He said Detective Carrigan, not he, was the person who made many of the statements about religion. He said that a common interviewing technique was "mirroring," or aligning oneself with a suspect's

---

1. Detective Cooley testified that the second interview was conducted by another officer because Detective Cooley was sick the day the interview took place.

personality and body posture, and finding common ground to discuss.

John Pickler testified for the defendant at the suppression hearing that he had known the defendant for over twenty years and was familiar with the defendant's beliefs. He said that he was a deacon at the defendant's church and that the defendant attended church three times per week and assisted with maintenance tasks at the church. He gave his opinion that the defendant was sincere and devout in his religious beliefs.

The defendant did not testify at the suppression hearing. At trial, he testified that he returned to the police station repeatedly for questioning "[b]ecause [he] was trying to help them to clear up the case to get back with [his] family." He said that although the questions in the third interview were similar to the first two interviews, the detectives were "also going into religious belief and other type questions[.]" When asked whether he made the admissions in the third interview because of the way in which the detectives used religion, he replied, "That and a lot of other questions I imagine."

The trial court denied the defendant's motion to suppress after reviewing the video recordings of the first and third interviews and the audio recording of the second interview and receiving the testimony of Detective Cooley and Mr. Pickler. The court entered a detailed written order, in which it found that the detectives' use of religion in the interview was "questionable" but that their behavior did not overbear the defendant's will. Thus, the court found that the statement was admissible. The court noted that there was no Tennessee law on point regarding a confession following religious references by law enforcement agents.

The defendant contends on appeal that the totality of the circumstances demonstrates that the detectives overbore his free will by exploiting his religious beliefs and fragile state of mind. He argues that there was evidence he had recently considered suicide, was in poor health, had no experience as a suspect, and had never been questioned by the police. The defendant acknowledges a lack of Tennessee authority on the subject of religious references during an interrogation and cites cases from other jurisdictions which have held that confessions should have been excluded as coercive when religious discussions invaded the interrogation process.

We note at the outset that despite the defendant's citations to cases in which a confession obtained following religious discussion was suppressed, there are many cases from other jurisdictions that have admitted confessions obtained after religious references were made by police during the questioning of suspects. *See, e.g., State v. Ackward,* 281 Kan. 2, 128 P.3d 382 (2006) (ruling that confession was admissible despite officers' appeal to defendant's religious beliefs). *See generally* Robin Miller, Annotation, *Voluntary Nature of Confession as Affected by Appeal to Religious Beliefs,* 20 A.L.R.6th 479 (2006) (surveying cases which analyzed admissibility of confessions obtained when religion was discussed in varying degrees in the interrogation). Further, we note that both parties have overlooked *McGee v. State,* 2 Tenn.Crim.App. 100, 451 S.W.2d 709 (1969), in which this court held that a suspect's confession was not coerced when an officer asked him whether he believed in God. Similarly, in *State v. Riaco Leverston,* No. W2006–02304–CCA–R3–CD, Shelby County, 2007 WL 4245725 (Tenn. Crim.App. Dec. 3, 2007),[2] this court consid-

---

**2.** The *Riaco Leverston* opinion was filed after   the defendant's brief was filed and three days

ered whether a defendant's confession had been coerced when the defendant claimed that he had asked for his attorney but was not given the opportunity to speak with him and that a police officer talked to him about the Bible and religion, and told him he should confess to the police and the Lord. This court upheld the trial court's denial of the motion to suppress based upon its discrediting of the defendant's testimony, the defendant's signed waiver of rights, and the defendant's mental state, education, and intelligence.

The totality of the circumstances includes evidence that this was the defendant's third interview with the police and that he had been cooperative, albeit not entirely forthcoming, with them throughout the process. The defendant had considered suicide, but he was under the care of a mental health professional and professed in the interview his disinclination to follow through with suicide. There was no evidence he suffered from any drug or alcohol addictions or that he was under the influence at the time of the interview. The defendant was a high school graduate and had completed some vocational training. The defendant was actively involved in his church and appeared to a deacon of his church to be a man of sincere faith. Prior to these allegations arising, the defendant had lived with and supported his family, and he continued to support them after living separately following the allegations. In the interview, the detectives covered a variety of topics in their efforts to obtain a confession from the defendant. One of those topics was religion. In an earlier interview, the defendant had mentioned his religious beliefs as contrary to sexually abusing his daughter. In the video recording of the interview, the defendant did not exhibit any obvious distress when religion was mentioned. From beginning to

before the state filed its brief.

end, he appeared cooperative, and the detectives never raised their voices, argued with him, or threatened him. There was no audibly or visibly obvious reaction during the religious references. There is no evidence that the religious references had any actual coercive effect on the defendant and that his will was overborne, prompting a confession that would not have occurred otherwise. Upon consideration of all the evidence, we hold that the trial court did not abuse its discretion in determining that the defendant's confession had not been the product of coercion.

We acknowledge that questioning involving religious references has the potential to be coercive. However, we do not believe that either the federal or state constitutions mandate a *per se* bar against contextual discussions of religion. *See, e.g., State v. Newell,* 212 Ariz. 389, 132 P.3d 833, 844 (2006) ("Appeals to religion do not render confessions involuntary unless they lead to the suspect's will being overborne."); *State v. Hill,* 361 S.C. 297, 604 S.E.2d 696, 701 (2004) (same). Rather, the proper focus remains on the totality of the circumstances and whether the defendant's will was overborne by the police use of religious references. *See United States v. Miller,* 132 F.3d 1028, 1031 (9th Cir.1993) ("In psychological coercion cases, we must consider the totality of the circumstances involved and their effect upon the will of the defendant."). *See generally Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

## II

The defendant also challenges the length of the sentences he received and the imposition of consecutive sentencing. He argues that the trial court incorrectly applied an enhancement factor and failed to find two mitigating factors in setting the length

of the sentences and that his offenses were not of such an aggravated nature as to justify consecutive sentencing.

■ As a preliminary matter, we note that the trial court applied the sentencing laws that were in effect at the time of the sentencing hearing, not those that were in effect at the time of the offenses. On June 7, 2005, the General Assembly amended Tennessee Code Annotated sections 40–35–102(6), –114, –210, –401. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 1, 5, 6, 8. However, the amended code sections are inapplicable to the defendant's appeal. The defendant was sentenced after the change in the sentencing laws took effect, and he signed a waiver allowing for judicial determination of all sentencing issues, including enhancement factors. His waiver did not, however, provide for waiver of his ex post facto protections and for sentencing under the new laws. *See* T.C.A. § 40–35–210, Compiler's Notes. Therefore, the sentencing law in effect at the time of the offenses was the proper framework for establishing the defendant's sentences. *See, e.g., State v. Daryl S. Hooper,* No. M2007–00094–CCA–R3–CD, Humphreys County, 2008 WL 2521592 (Tenn.Crim. App. June 24, 2008).

■ The 2005 Act and its predecessor are different in several respects. *See State v. Carter,* 254 S.W.3d 335 (Tenn. 2008) (examining differences in Sentencing Act before and after 2005 amendments). The prior law established a presumptive sentence of the minimum within the range for Class B, C, D, and E felonies and the midpoint of the range for Class A felonies. T.C.A. § 40–35–210(c) (2003). The court then applied enhancement factors and mitigating factors to increase and decrease, respectively, the sentence within the range. *See id.,* §§ 40–35–113, –114, –210 (2003). The weight to be afforded the enhancement and mitigating factors was

reserved for the trial court's discretion. *Id.,* § 40–35–210, Sentencing Comm'n Cmts. (2003). For some time, Tennessee courts followed the rule that facts used by the trial court for sentence enhancement must be proven by a preponderance of the evidence. *State v. Winfield,* 23 S.W.3d 279, 283 (Tenn.2000). However, the propriety of judicial, as opposed to jury, fact-finding developed as an area of concern based upon *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), which held that facts used to enhance punishment must be found by a jury beyond a reasonable doubt. The Tennessee Supreme Court initially held that the wording of the Tennessee sentencing act complied with the principles of *Blakely* and *Apprendi. State v. Gomez,* 163 S.W.3d 632 (Tenn.2005) (*"Gomez I "*). However, following *Cunningham v. California,* 549 U.S. 270, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007), and the United States Supreme Court's remand of *Gomez I* to the Tennessee Supreme Court, the court concluded that parts of the 1989 Sentencing Act did not comply with those principles. *See State v. Gomez,* 239 S.W.3d 733 (Tenn.2007) (*"Gomez II"*). Thus, a sentencing court applying the pre–2005 sentencing law cannot enhance a defendant's sentence above the presumptive minimum unless the facts relied upon to support the enhancement were found by a jury beyond a reasonable doubt or, as in the present case, were found by the trial court beyond a reasonable doubt, in the event the defendant had waived his right to jury determination in favor of judicial fact finding.

The trial court in the present case applied the 2005 Act, which is different in several respects. Significantly, the 2005 Act removed the provisions requiring the trial court to make factual findings upon

which it could then enhance a sentence from the minimum, presumptive sentence. Instead, the new act provides that the court shall set a sentence within the range and that in doing so, the court consider that the minimum sentence should be imposed and that the length should be adjusted as appropriate for any enhancement and mitigating factors. T.C.A. § 40–35–210(c). In doing so, the court "shall consider, but is not bound by" certain "advisory sentencing guidelines," which include that the sentence should be adjusted, as appropriate, for any enhancement or mitigating factors shown. *Id.*, § 40–35–210(c)(2).

In light of these differences and the trial court's application of the wrong law, we conclude that this case must be remanded for resentencing under the Sentencing Act that existed at the time of the offenses, rather than as it exists after the 2005 amendments. Given the potential for sentencing lengths to affect consecutive sentencing, resentencing shall include the issue of consecutive sentencing. *See State v. Marshall*, 888 S.W.2d 786 (Tenn.Crim.App. 1994) (approving trial court's adjusting lengths of sentences in considering whether to impose consecutive sentencing).

In consideration of the foregoing and the record as a whole, the convictions are affirmed, but the sentences are reversed. The case is remanded for resentencing in accord with this opinion.