IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 21, 2010

# STATE OF TENNESSEE v. JAMES H. SAINT, JR.

**Appeal from the Criminal Court for Davidson County**
**No. 2005-C-2234     Cheryl Blackburn, Judge**

_____

**No. M2009-01278-CCA-R3-CD - Filed May 26, 2010**

_____

The Defendant, James H. Saint, Jr., was convicted of six counts of aggravated sexual battery, a Class B felony. See Tenn. Code Ann. § 39-13-504(b). The trial court, applying the 2005 Amendments to our Sentencing Act, originally sentenced the Defendant to serve sixty-six years in the Department of Correction. On his first appeal, however, we reversed his sentences and remanded his case for resentencing under the 1989 Act. See State v. Saint, 284 S.W.3d 340, 348 (Tenn. Crim. App. 2008). Following a resentencing hearing, held on May 14, 2009, the trial court again sentenced the Defendant as a Range I, standard offender to eleven years for each of his six convictions, those sentences to be served consecutively to one another, for a total effective sentence of sixty-six years in the Department of Correction. On this appeal, the Defendant contends that the trial court erred in setting the length of his sentences and in ordering him to serve them consecutively. After our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Emma Ray Tennent, Assistant Public Defender, Nashville, Tennessee, for the appellant, James H. Saint, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background

In the Defendant's first appeal, we summarized the facts underlying this case as follows:

>    The [D]efendant's convictions relate to inappropriate touching of his daughter on various occasions between January 2000 and September 2004, during which time the victim was between four and eight years of age. At trial, the [S]tate's evidence included the victim's testimony regarding the incidents and the [D]efendant's videotaped statements, in which he initially denied inappropriate contact, then said he did not remember it, but later admitted having the victim lie on top of him when he was lying in her bed for a bedtime "prayer session" and touching her. The [D]efendant admitted that he would become slightly aroused and stated that he wanted to touch and hug the victim more and wanted to show his love for the victim. He also admitted that the victim had touched his genitals. The [D]efendant testified at trial that he did not intentionally touch the victim. He said he had attempted to explain during the last interview that he might have rolled over to hug his daughter and accidentally touched her. He claimed he had no memory of touching the victim, but he acknowledged it might have occurred. He admitted he assisted the victim with bathing and undressing when she requested help, but he denied the victim's allegation that he had fondled her while she was bathing. He said a note he wrote to the victim during the third interview in which he apologized to the victim was an apology for accidental, not intentional, touching and for the family's financial difficulties.

>    . . . .

>    The record reflects that the [D]efendant was questioned by the police three times, in October 2004, March 2005, and April 2005. During the first two interviews, the [D]efendant denied any sexual misconduct with his daughter. He said during the first interview that he sometimes assisted his daughter with bathing in the evenings and would afterwards lie down, hug, and hold hands with her. The [D]efendant said he sometimes fell asleep and that the touching might have occurred while he was asleep, although he did not remember it. In the second interview, he again denied any inappropriate contact with his daughter. He said that if he ever touched her, it was when he was asleep or when they were play wrestling. The [D]efendant stated that he

-2-

attended church regularly and did not believe in having contact of a sexual nature with children.

The third interview lasted approximately two and one-half hours and was conducted by two detectives. The third interview took place at the police station, although the [D]efendant arrived voluntarily and was told he was free to leave at any time. A videotape of the interview is part of the record. The detectives included in their discussion with the [D]efendant references to the Bible, their religious beliefs, and the [D]efendant's religion. These references were interspersed in their discussion of: the victim's allegations; the need for the [D]efendant to admit and to take responsibility for his actions, both for the victim's and his own benefit; the detectives' disbelief of the [D]efendant's previous statement that he did not remember touching the victim; and their urgings to the [D]efendant to be forthcoming.

. . . .

Approximately one hour into the interview, the [D]efendant began acknowledging misconduct with the victim, although he claimed to have no memory of it. At this point, the detectives had made about half of the religious references. The detectives continued prodding the [D]efendant to admit what he had done. After about thirty more minutes of discussion that included religious references, the [D]efendant began to admit in piecemeal fashion his inappropriate touching of the victim. The [D]efendant continued to provide detail, without further substantial religious references by the detectives, and agreed to a summary of his admissions recounted by one of the detectives. He then agreed to write a letter to the victim and asked questions about what would happen next. He was allowed to leave at the conclusion of the interview.

Detective Kevin Cooley testified at the suppression hearing that he and Detective Carrigan conducted the third interview of the [D]efendant. He said the previous two interviews had yielded no admissions and that he "was out of techniques" going into the third interview. He said that prior to conducting the third interview, he knew several things about the [D]efendant, including that the [D]efendant had worked as a laborer at the Law Enforcement Training Academy for many years before becoming disabled, that the [D]efendant was having marital troubles, that the [D]efendant attended a Southern Baptist church, that the [D]efendant had considered suicide recently, and that the [D]efendant and his family were experiencing financial difficulties. He said

that he usually did not talk about religion in interviews with suspects, but in this case, the detectives decided to do so because the allegation was that the [D]efendant had sexually abused his daughter while praying and lying in bed with her. He said Detective Carrigan, not he, was the person who made many of the statements about religion. He said that a common interviewing technique was "mirroring," or aligning oneself with a suspect's personality and body posture, and finding common ground to discuss.

John Pickler testified for the [D]efendant at the suppression hearing that he had known the [D]efendant for over twenty years and was familiar with the [D]efendant's beliefs. He said that he was a deacon at the [D]efendant's church and that the [D]efendant attended church three times per week and assisted with maintenance tasks at the church. He gave his opinion that the [D]efendant was sincere and devout in his religious beliefs.

The [D]efendant did not testify at the suppression hearing. At trial, he testified that he returned to the police station repeatedly for questioning "[b]ecause [he] was trying to help them to clear up the case to get back with [his] family." He said that although the questions in the third interview were similar to the first two interviews, the detectives were "also going into religious belief and other type questions[.]" When asked whether he made the admissions in the third interview because of the way in which the detectives used religion, he replied, "That and a lot of other questions I imagine."

State v. Saint, 284 S.W.3d 340, 342-45 (Tenn. Crim. App. 2008) (footnote omitted).

No testimony was presented at either of the Defendant's sentencing hearings. After his second sentencing hearing, the Defendant was again sentenced to an effective sentence of sixty-six years in the Department of Correction. He now appeals.

**Analysis**

The Defendant contends that the trial court erred in setting the length of his sentences and ordering that they be served consecutively to one another. Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210(b); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to

place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. See State v. Fletcher, 805 S.W. 2d 785, 789 (Tenn. Crim. App. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act and (2) the trial court's findings are adequately supported by the record. See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.

The presentence report in this case indicates that, at the time of sentencing, the Defendant was fifty-six years old. He had no prior criminal record. He reported some health problems, and had been employed by the State of Tennessee as a maintenance worker from July 1972 to April 2004. He had attended Hume Fogg High School and Nashville State Technical Community College.

## I. Length of Sentence

The Tennessee legislature recently amended several provisions of the Criminal Sentencing Reform Act of 1989, those changes becoming effective June 7, 2005. The Defendant's conduct occurred prior to that date, and he was sentenced after it. As such, the Defendant could have elected to be sentenced under the revised Act by executing a waiver of his ex post facto protections. See Tenn. Pub. Acts ch. 353, § 18. He did not execute such a waiver, however, and was therefore sentenced under the 2003 codification of the Act. That codification violated the United States Supreme Court's requirement that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). The statutory maximum "is not

the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." Blakely v. Washington, 542 U.S. 296, 305-06 (2004). As such, a trial judge applying the 2003 codification of the Act normally may impose a sentence that exceeds the presumptive sentence based only on the fact of a defendant's prior conviction(s) or on other enhancement factors found by the jury or admitted by a defendant. Id. at 301-04.

In this case, however, the Defendant waived the requirement that a jury determine applicable enhancement factors, instead electing to have the trial court determine, beyond a reasonable doubt, whether any such factors applied. As a Range I, standard offender, the Defendant faced a sentencing range of eight to twelve years for each of his Class B felony convictions. See Tenn. Code Ann. § 40-35-112(a)(2). In enhancing the Defendant's sentences above the presumptive minimum of eight years, the trial court found: that he had a previous history of criminal behavior in addition to that necessary to establish the appropriate range;[1] that the "victim of the offense was particularly vulnerable because of age or physical or mental disability" in that she suffered from attention deficit hyperactivity disorder and alopecia; and that the Defendant, as the victim's father, abused a position of private trust. See Tenn. Code Ann. §§ 40-35-114(2), (5), (16) (2003).

The Defendant concedes that the trial court correctly applied factors (2) and (16). He argues that it incorrectly applied factor (5) and incorrectly failed to apply as a mitigating factor that the Defendant's "criminal conduct neither caused nor threatened serious bodily injury." See Tenn. Code Ann. § 40-35-113(1).

We need not decide whether the trial court erred in finding that the victim was particularly vulnerable because of age or physical or mental disability because we conclude that the two enhancement factors found by the trial court, and conceded by the Defendant, justify his eleven-year sentences. We note that the trial court gave "great weight" to the enhancement factor that the Defendant, who was the victim's father, abused a position of private trust. Regarding the proposed mitigating factor, based on the facts and circumstances of this case, we cannot conclude that the trial court erred by failing to apply as a mitigating factor that the conduct neither caused nor threatened serious bodily injury. Even if applicable, we conclude that this factor would be entitled to very little weight. The Defendant is not entitled to relief on this issue.

---

[1] Although the presentence report reflects no prior convictions, the trial court specifically found a history of criminal behavior based upon testimony presented during the Defendant's trial.

## II. Consecutive Sentencing

The Defendant next contends that the trial court erred in ordering him to serve his sentences consecutively to one another. Tennessee Code Annotated section 40-35-115(b) provides that a trial court may, in its discretion, order sentences to run consecutively if it finds any one of a number of criteria by a preponderance of the evidence. In this case, the trial court imposed consecutive sentencing based on its finding of the criterion outlined in Tennessee Code Annotated section 40-35-115(b)(5):

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

The Defendant is correct that consecutive sentences "should not routinely be imposed in sexual abuse cases" as a result of section 40-35-115(b)(5). The record, however, supports the trial court's application of that section based on the specific aggravating factors outlined therein: the Defendant is the victim's father and his crimes went undetected for nearly four years. We cannot conclude that the trial court erred in ordering the Defendant to serve his sentences consecutively on this basis.

### Conclusion

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
DAVID H. WELLES, JUDGE