# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 9, 2012

## STATE OF TENNESSEE v. JAY DEE GARRITY

**Appeal from the Criminal Court of Davidson County**
**No. 2009-C-2411     Monte Watkins, Judge**

---

**No. M2010-02592-CCA-R3-CD - Filed September 11, 2011**

---

Jay Garrity ("the Defendant") was convicted of three counts of aggravated sexual battery, a Class B felony. After a hearing, the trial court sentenced the Defendant as a multiple offender to sixteen years on each count and ordered the sentences to be served consecutively for a total effective sentence of forty-eight years. The Defendant now appeals, arguing that the trial court erred "in allowing the State to call a 'surprise' witness." He also claims that the evidence is insufficient to support his convictions. Finally, the Defendant challenges the length and consecutive service of his sentences. After a thorough review of the record and the applicable law, we affirm the Defendant's convictions. We, however, are compelled to vacate the Defendant's sentence and remand for a new sentencing hearing.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part, and Vacated in Part; Case Remanded

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Michael Colavecchio, Nashville, Tennessee, for the appellant, Jay Garrity.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. Johnson III, District Attorney General; and Sharon Reddick, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

A Davidson County Grand Jury indicted the Defendant on three counts of aggravated sexual battery. The victim in this case is the Defendant's stepdaughter, B.L.[1] The Defendant waived his right to a jury trial and was tried in a bench trial on September 13, 2010.

During the State's opening statement, defense counsel objected to the State discussing the possible testimony of a family member named Betty Sue Blalock. Defense counsel claimed that the State failed to adequately inform the defense about the identity of this witness and the information to which she might testify. The State responded,

> Judge, respectfully, that is a completely disingenuous statement of the facts. I told [defense counsel] probably two months ago about this witness. I gave him her name as I knew it at the time. I asked[] Mr. Halstead to add her to the indictment. And I told [defense counsel] precisely last week exactly what she would be testifying to, that she would be here this weekend if he wanted to talk to her.

Defense counsel responded that he received the witness's name only the week before trial. Because of the short notice, defense counsel asserted that he did not have sufficient time to investigate possible attacks to her credibility. The trial court stated, "I am going to allow the [State] to continue on with her opening statement. . . . I'll allow you the opportunity to speak with this potential witness." Defense counsel acknowledged that the State already had given him the opportunity to meet with the potential witness prior to the start of the trial.

The mother of the victim ("Mother") testified at trial that the Defendant is her ex-husband. She married the Defendant in 1993 and divorced him approximately one year before trial. In 1996, Mother and the Defendant moved from Oklahoma to Nashville along with her son, S.R., and daughter, B.L. While in Nashville, Mother's job kept her from being able to pick up the kids from school. As a result, S.R. would ride the bus home, and the Defendant would pick up B.L., who was six years old in 1996. Over time, Mother noticed that the Defendant spent more time with B.L. and seemed to push S.R. away. The Defendant took B.L. with him anywhere he went, even if he only was going out to buy a pack of

---

[1] In cases involving child sex offenses, it is the policy of this Court to refer to victims using their initials. We also will refer to B.L.'s brother using his initials, S.R. We will refer to the mother of the children as "Mother" to protect the identity of the children.

cigarettes. This behavior continued once the family moved back to Oklahoma in 1999. Most nights, when Mother returned home, S.R. would be out playing with friends, and the Defendant and B.L. would be alone together.

Mother stated that while living in Nashville her brother stayed with her family for approximately a month. When her family moved back to Oklahoma in 1999, her brother lived with her family again for an extended period of time.

During the latter part of their time in Nashville, they lived in the Burning Tree Apartments. Mother and the Defendant shared a room and bathroom, and each of the kids had their own bedroom and shared a bathroom. Mother and the Defendant separated in 2003. Around 2006, Mother tried to locate the Defendant for the purpose of finalizing their divorce. As she searched the internet, something caught her attention, and the thought struck her that the Defendant possibly had sexually abused B.L. When Mother picked up B.L. from school later that day, she asked B.L. if the Defendant ever had touched her or acted inappropriately. Mother stated, "[B.L.] turned her head and looked out the window and was quiet. And when she turned back around, tears were just streaming, and she said yes." Mother pressed B.L. for more information, but, initially, B.L. was reluctant to provide details. Sometime in the next six months, Mother received a phone call from the Defendant. Mother and B.L. picked up two different receivers, and Mother "told him [she] knew what he did." According to Mother, the Defendant responded, "[B.L.] is a liar." The Defendant also claimed that it was Mother's brother and not him who was responsible. After this phone conversation, Mother initiated criminal charges against the Defendant in Oklahoma.

B.L. testified[2] that when they were living in Nashville, she had learned a saying at school: "Chinese, Japanese, dirty knees, look at these." She had gotten in trouble for repeating the saying to Mother and the Defendant. Approximately a week later, the Defendant picked up B.L. from school and asked her to repeat the saying that she had learned. He asked her to lift up her shirt, and he proceeded to touch her breasts. B.L. stated that this occurred in their living room. The Defendant later told her that her saying that phrase gave him the idea to touch her, and, accordingly, she felt responsible for his actions. On a different occasion, the Defendant lifted B.L.'s shirt and touched her breasts after calling her into his bedroom to take a "nap." According to B.L., he also "unzipped his pants and pulled them down" and "touch[ed] his genitals." She testified that his touching her breasts happened "repeatedly" or "almost every day." On a third occasion, the Defendant asked her to come into the bathroom. He already was in the bathroom with the door closed. When she entered, she realized that he was naked. He put his hand on hers and "had [her] rub his

_____

[2] B.L. was twenty years old at the time of trial.

penis." In all the instances that occurred in Nashville, she did not remember the Defendant ejaculating.

B.L. testified that the Defendant continued to touch her breasts and masturbate after they moved from Nashville until she was thirteen years old. Initially, B.L. stated that she and the Defendant were always home alone when the Defendant would touch her. On cross-examination, however, she remembered one instance in which the Defendant touched her in his bedroom while family members were in the kitchen.

B.L. stated that the Defendant warned her not to tell anyone or that he would say it was B.L.'s uncle or brother. B.L. also was afraid that her mother would not believe her. Thus, she didn't tell Mother until she was fifteen years old. She stated, "She had picked me up from school, and we were on our way back to her job. And she had asked me again if [the Defendant] had ever touched me. And I stood silent for a couple of minutes, and then I finally said yes. And then she just started crying." B.L. also testified about the time that the Defendant called the house after she told her mother of his touching her. According to B.L., Mother said, "I know what you did to her," and the Defendant responded, "Did what? I didn't do nothing. It was [your brother]."

The State called Betty Sue Blalock to testify. The defense renewed its objection regarding the trial court allowing this witness to testify. Defense counsel stated, "I did get an opportunity to speak with [Blalock], Your Honor. I've had absolutely no opportunity to do anything else, what I would normally do with a witness if I knew the information." The trial court responded, "I am going to allow her to testify if you've had an opportunity to speak with her."

Blalock testified that she is related to Mother by marriage. She lives in Oklahoma near the area where Mother now lives. She remembered visiting Mother on one occasion when Mother and her family lived in Nashville. She was sitting at the kitchen table with B.L., the Defendant, Blalock's husband, and Mother's brother. According to Blalock, the Defendant said to B.L., "Come on, [B.L.], it's time to take a nap. Come on, you've got to take a nap." Blalock asked the Defendant why B.L. needed to take a nap. The Defendant responded that they would not be able to stand being around B.L. if she didn't take a nap. Then the Defendant and B.L. went into the Defendant's bedroom and closed the door. Blalock believed that B.L. was approximately eight years old at that time. Neither Mother nor S.R. were at home when this incident occurred.

Detective Rachel Black, Metro Police Department sex crimes division, testified that she became involved in the investigation of this case following reports provided by a police department in Oklahoma. Detective Black requested the case file from Oklahoma but

received only a summary sheet of less than one page and a video containing a forensic interview of B.L.

The State submitted the following as its election of offenses:

Count 1 Aggravated Sexual Battery – refers to the first incident the victim can recall of the defendant fondling her breasts shortly after she'd been punished for reciting the rhyme "Chinese, Japanese, Dirty knees, Look at these." This incident occurred in the living room in the family's apartment at Burning Tree Apartments in Hermitage.

Count 2 Aggravated Sexual Battery – refers to an incident wherein the defendant fondled the victim's breasts in the defendant's bedroom after telling her to come in the bedroom for a "nap." This incident occurred in the master bedroom in the family's apartment at Burning Tree Apartments in Hermitage.

Count 3 Aggravated Sexual Battery – refers to an incident of the defendant forcing the victim to masturbate his penis with her hand after calling her into his bathroom. This incident occurred in the master bathroom in the family's apartment at Burning Tree Apartments in Hermitage.

The Defendant did not testify and offered no proof. The trial court deliberated and returned a verdict of guilty on all three counts of aggravated sexual battery.

At the sentencing hearing, the State and defense counsel agreed that the Defendant was a Range II offender. B.L. testified that the number of times the Defendant inappropriately touched her were actually "too many to count." The touching began when she was seven or eight years old and continued until she was approximately thirteen years old. B.L. stated that since that time she has struggled with anger issues and has attended counseling. She has panic attacks and nightmares about her daughter undergoing the same experience. She stated, "It has caused me to resent my mom. It's caused problems between [sic] my marriage[] because I take my anger out on my husband. I have a problem trusting men. Any time I go anywhere and it's . . . night, I'm always worried that someone's going to, you know, get me or something."

The Defendant testified that "the allegations are totally false. And if I had more time to hire a private investigator, I could prove these facts. The same allegations were brought [against Mother's] first husband using the son when they divorced." As a result of the charges brought against the Defendant in Oklahoma, the Defendant received two years' probation. On cross-examination, the Defendant acknowledged that he was convicted of fraud in 1991, for which he served three and a half years in incarceration and six and a half

years on probation. The Defendant also acknowledged that he was convicted in 2004 or 2005 of reckless driving. He also was charged, but not convicted, of assault in the 1980's.

At the conclusion of the sentencing hearing, the trial court found that based on Tennessee Code Annotated section 40-35-103 "confinement is necessary to avoid depreciating the seriousness of the offense and is particularly suited to provide an effective deterrence to others likely to commit similar offenses."

Regarding mitigating factors, the Defendant argued that his conduct neither caused nor threatened serious bodily injury, asserting that the statute intends physical and not solely mental harm. The trial court, however, found that no mitigating factors applied. Regarding enhancement factors, the trial court found that two factors applied: (1) "that the defendant has a prior history of criminal behavior and criminal convictions"; and (2) "that the defendant abused a position of private trust."[3] Accordingly, the trial court sentenced the Defendant to sixteen years on each count, stating, "the range is twelve to twenty [years]. So that puts him right in the middle of the range, quite honestly, after the enhancement factors."

Next, the trial court determined whether the sentences should run concurrently or consecutively. The trial court stated,

> [T]he Court is persuaded by [Tennessee Code Annotated section] 40-35-115, Subsection 5, the defendant is convicted of two or more statutory offenses involving sexual abuse of a minor. And, finally, the Court believes that that particularly applies to the defendant. As such, the Court believes that the sentences should run consecutively for a total of forty-eight years. And the Court is further persuaded that it is necessary to protect the public against further criminal activity by the defendant and that consecutive sentences – the consecutive sentence reasonably relates to the seriousness of the offense committed. As such, the sentence will be forty-eight years.

The Defendant timely filed a motion for new trial, raising four issues: (1) the trial court's decision to allow the State to call a witness not originally listed in the indictment; (2) sufficiency of the evidence; (3) the length of the Defendant's sentences; and (4) the consecutive service of the sentences. Following a hearing, the trial court denied the Defendant's motion for new trial. The Defendant timely appeals, asserting the same issues raised in his motion for new trial.

---

[3] The trial court did not indicate the amount of weight placed on either factor.

**Analysis**

*Allowing Witness to Testify*

The Defendant asserts that the trial court erred "in allowing the State to call a 'surprise' witness, Ms. Betty Blalock, without properly notifying either the court or the [Defendant] until the last business day before trial." The State responds that the Defendant has failed to show that he suffered any prejudice as a result of the late disclosure.

The State must include in the indictment "the names of such witnesses as [it] intends shall be summoned in the cause." Tenn. Code Ann. § 40-17-106 (1991). However, the statute "is directory only and does not necessarily disqualify a witness whose name does not appear on the indictment from testifying." State v. Harris, 839 S.W.2d 54, 69 (Tenn. 1992) (citing State v. Street, 768 S.W.2d 703, 710-11 (Tenn. Crim. App. 1988)). Rather, the purpose of the statute is to furnish the names of potential witnesses in order to prevent surprise for the defense at trial. See State v. Melson, 638 S.W.2d 342, 364 (Tenn. 1982). In order to obtain relief, a defendant must show "prejudice, bad faith, or undue advantage" as a result of the State's delay in furnishing the witnesses' names. Harris, 839 S.W.2d at 69 (citing State v. Baker, 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987); State v. Craft, 743 S.W.2d 203 (Tenn. Crim. App. 1987)). "Moreover, prejudice to the defendant must result from the lack of notice [and] not the prejudice which resulted from the witness's testimony." State v. Billy Joe Carter, No. E2005-01282-CCA-R3-CD, 2007 WL 1515010, at *12 (Tenn. Crim. App. May 24, 2007) (citations omitted). Additionally, Rule 16 of the Tennessee Rules of Criminal Procedure "does not authorize pretrial discovery of the names and addresses of State's witnesses." State v. Martin, 634 S.W.2d 639, 643 (Tenn. Crim. App. 1982).

When the Defendant objected to Blalock's testimony, the trial court allowed defense counsel the opportunity to interview her prior to the State calling her to testify. Moreover, the State already had allowed defense counsel that opportunity before the beginning of trial. Although the State initially failed to include Blalock's name in the indictment as a potential witness, the Defendant has failed to show "prejudice, bad faith, or undue advantage." Harris, 839 S.W.2d at 69. Thus, without a showing of prejudice by the Defendant, the trial court did not abuse its discretion in allowing the State to call Blalock as a witness at trial.

*Sufficiency of the Evidence*

When assessing the sufficiency of the evidence following a conviction from a bench trial, "the verdict of the trial judge is entitled to the same weight on appeal as a jury verdict." State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (citing State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978)). Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. Harris, 839 S.W.2d at 75. Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

Aggravated sexual battery is defined as the "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [and] (4) The victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a) (Supp. 1993). "Sexual contact" is

> the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification.

Tenn. Code Ann. § 39-13-501(6) (1991). "Intimate parts" is defined as including "the primary genital area, groin, inner thigh, buttock or breast of a human being." Id. at § -501(2).

The first elected offense alleged by the State was that the Defendant touched B.L.'s breasts shortly after she got in trouble for saying "Chinese, Japanese, dirty knees, look at these." B.L. testified at trial that she had learned the above saying at school and had gotten in trouble for repeating it. Shortly after getting in trouble, when the Defendant picked B.L. up from school, he asked her to repeat the saying. When she did so, the Defendant asked B.L. to lift up her shirt, and he proceeded to touch her breasts. He also told her that the saying was the reason he had the idea to touch her breasts.

The second elected offense alleged was that the Defendant touched B.L.'s breasts in his bedroom. B.L. testified that one day the Defendant called her into his room for a "nap." When she entered the room, he proceeded to touch her breasts. She also stated that the Defendant exposed and rubbed his genitalia.

The third elected offense that the State alleged was that the Defendant convinced B.L. to rub his penis with her hand after calling her into his bathroom. B.L. testified at trial that on one occasion the Defendant asked her to come into his bathroom. He already was in the bathroom with the door closed. When she entered, she found the Defendant naked. According to B.L., the Defendant put his hand on hers and "had [her] rub his penis."

The Defendant argues that inconsistencies exist in the testimonies of Mother and B.L., and he asserts that "the proof was so inconsistent that these inconsistencies amount to reasonable doubt." Specifically, he points to Mother's testimony that B.L. cried and B.L.'s testimony that Mother cried when B.L. admitted to Mother that the Defendant touched her. He also notes the differences in their accounts as to how much they discussed on the day of B.L.'s admission and exactly what the Defendant said when he called six months later.

To the extent that the testimonies of Mother and B.L. are inconsistent, we will not disturb the determinations of the trier of fact as to "[q]uestions concerning the credibility of witnesses, the weight and value of the evidence, [and] all factual disputes raised by the evidence." State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002) (citing Holder, 15 S.W.3d at 912).

The Defendant also asserts that the State has failed to establish that the Defendant touched B.L. or had B.L. touch the Defendant "for the purpose of sexual arousal or gratification" because B.L. testified that the Defendant never ejaculated during the instances that he touched her in Nashville. The State contends that because of "the repetitive nature of the conduct and the defendant's masturbation during the episodes, the 'intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification.'" (quoting Tenn. Code Ann. § 39-13-501(6)).

In many cases, intent only may be proven through circumstantial evidence. See Hall v. State, 490 S.W.2d 495, 496 (Tenn. 1973). In State v. Hayes, 899 S.W.2d 175, 180 (Tenn. Crim. App. 1995), this Court looked at several circumstances surrounding the defendant's behavior to establish sufficiently the defendant's intent and purpose, including "the timing of the events when the mother was not present, the location of the events, the state of dress of the defendant and the victim, and how the physical contact occurred."

When viewed in the light most favorable to the State, the proof at trial demonstrated that the Defendant almost exclusively touched B.L. when they were at home alone. When

he touched her breasts while in his bedroom, he exposed and rubbed his genitalia. He told B.L. not to tell anyone or else he would say it was B.L.'s uncle or brother. On one occasion when he called her into his bathroom, he was naked. Given the circumstances surrounding the conduct, there was sufficient evidence for the trier of fact to find that the "intentional touching [could] be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6). Thus, the State's proof at trial was sufficient to support the Defendant's convictions for three counts of aggravated sexual battery. The Defendant is entitled to no relief on this issue.

*Sentencing*

*Length of Sentences*

The Defendant asserts that the trial court erred in the length and consecutive service of his sentences. When a defendant challenges the length, range, or manner of service of a sentence, the applicable standard of review is de novo on the record with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d) (1990). However, this presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If the trial court did not do so, then the presumption fails, and this Court's review is de novo with no presumption of correctness. State v. Pierce, 138 S.W.3d 820, 827 (Tenn. 2004). However, if the trial court considered the statutory criteria, imposed a lawful but not excessive sentence, stated its reasons for the sentence on the record, and its findings are supported by the record, then this Court is bound by the trial court's decision. State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). On appeal, the party challenging the sentence has the burden of demonstrating that it is improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; Carter, 254 S.W.3d at 344.

Additionally, in cases involving criminal conduct that occurred prior to the 2005 amendments to the 1989 Sentencing Act, the trial court is required to place additional findings on the record. To facilitate appellate review, the trial court must "'state the specific facts supporting each enhancement factor found[] and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.'" State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997) (quoting State v. Jones, 883 S.W.2d 567, 601 (Tenn. 1994)).

In this case, the trial court did not specify its reasons for applying the two enhancement factors or for not applying the mitigating factor advanced by the Defendant. Additionally, the trial court did not make findings regarding the weight assigned to each enhancement factor. In the absence of these findings, our review of the Defendant's sentence must be de novo with no presumption of correctness.

In reviewing a sentence, this Court must consider the following: (a) any evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments of counsel regarding sentencing alternatives; (d) the nature and characteristics of the criminal conduct; (e) any enhancement or mitigating factors as provided in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement made by the defendant on his or her own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b) (1995 Supp.); see also Carter, 254 S.W.3d at 343.

The trial court sentenced the Defendant to sixteen years on each of his three counts of aggravated sexual battery, to be served consecutively in the Tennessee Department of Correction. In reaching its determination, the trial court applied the following two enhancement factors:

> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;[and]
>
> . . . .
>
> (15) The defendant abused a position of . . . private trust . . . .

Tenn. Code Ann. § 40-35-114 (Supp. 1995). In order to apply, enhancement factors always must be "appropriate for the offense" and "not themselves essential elements of the offense." Id.

On appeal, the Defendant does not challenge the trial court's application of the two statutory enhancement factors. However, because the criminal conduct resulting in the Defendant's convictions occurred from 1997 to 1999, we must apply the 1989 Sentencing Act prior to the 2005 amendments. That sentencing scheme violated the United States Supreme Court's requirement that "'[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" Blakely v. Washington, 542 U.S. 296, 301 (2004) (quoting Apprendi v. New Jersey, 530 U.S. 466, 490 (2000)). Blakely defined the "statutory maximum" as "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id. at 303. Thus, the "statutory maximum" is the presumptive sentence specified by statute for the particular offense. State v. Calvin Jerome Oliver, No. M2008-01824-CCA-R3-CD, 2010 WL 681377, at *8 (Tenn. Crim. App. Feb. 26, 2010). "The presumptive sentence may be exceeded without the participation of a jury only when the defendant has a prior conviction or when an otherwise applicable enhancement factor was reflected in the jury's verdict or was admitted by the defendant." Id. Furthermore, our supreme court held in State v. Gomez, 239 S.W.3d 733, 740 (Tenn. 2007) ("Gomez II"), that "to the extent the [1989 Sentencing]

-11-

Reform Act permitted enhancement based on judicially determined facts other than the fact of a prior conviction, it violated the Sixth Amendment as interpreted by the Supreme Court in Apprendi, Blakely and Cunningham [v. California, 549 U.S. 270 (2007)]."

Although the Defendant does not contest the trial court's application of statutory enhancement factors, we still may consider whether the trial court appropriately applied the factors under a plain error review. See Gomez II, 239 S.W.3d at 737. The doctrine of plain error provides that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). This Court may find plain error only if all five of the following factors are present: "(1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice." State v. Hester, 324 S.W.3d 1, 56 (Tenn. 2010) (citing Gomez II, 239 S.W.3d at 737); see also State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). It is the defendant's burden to persuade this Court that the trial court committed plain error and that the error "was of sufficient magnitude that it probably changed the outcome of the trial." Hester, 324 S.W.3d at 56 (citing State v. Bledsoe, 226 S.W.3d 349, 354-55 (Tenn. 2007)).

In the case before us, the record clearly establishes what occurred in the trial court. We have a full transcript of the sentencing hearing.

Thus, we next consider whether the trial court breached a clear and unequivocal rule of law in its application of one or both of the enhancement factors. The first factor applied by the trial court was that "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range." Tenn. Code Ann. § 40-35-114(1) (1995 Supp.). The State presented many facts for the trial court to consider in applying this factor, including the Defendant's fraud conviction, reckless driving conviction, and assault charge. The State also highlighted the victim's testimony at the trial and sentencing hearing that the Defendant touched her "repeatedly" – well over the three counts for which he was convicted. Additionally, the record indicates that the Defendant had two other prior convictions not mentioned by the State which the trial court apparently utilized to establish the Defendant as a Range II multiple offender.

We note that the trial court did not place findings on the record at the sentencing hearing as to which convictions it relied upon in establishing the Defendant's sentencing range. However, based on our de novo review, the record appears to contain sufficient evidence of prior criminal convictions beyond those necessary to establish the Defendant as a Range II offender to support application of this factor. Therefore, we do not find that the

trial court breached a clear and unequivocal rule of law in its application of this enhancement factor.

We next examine the trial court's application of factor (15), whether the Defendant "abused a position of . . . private trust," Tenn. Code Ann. § 40-35-114(14) (1995 Supp.). The Defendant did not admit to abusing his position and in fact continued to deny adamantly at the sentencing hearing that he abused B.L. Likewise, there was no jury finding on this issue. Therefore, we must conclude that a clear and unequivocal rule of law was breached in the application of this enhancement factor.

Our review of the record further indicates that a substantial right of the Defendant was adversely affected by the trial court's application of the abuse of private trust enhancement factor. Additionally, the record does not reflect that the Defendant waived this right for tactical reasons.[4]

Finally, we must determine whether consideration of this issue is necessary to ensure substantial justice. The trial court sentenced the Defendant as a Range II multiple offender. See Tenn. Code Ann. § 40-35-106 (1990). The Range II sentence for a Class B felony is "not less than twelve (12) nor more than twenty (20) years," Tenn. Code Ann. § 40-35-112(b)(2), and the trial court sentenced the Defendant to sixteen years. The trial court specifically noted that it was sentencing the Defendant to "the middle of the range" based on the application of both enhancement factors. Thus, the trial court enhanced his sentence based in part upon an impermissibly applied enhancement factor. Although application of the prior conviction enhancement factor in some cases may be sufficient to enhance a sentence, the record before us does not provide a sufficient basis on which we can affirm the Defendant's sentence. See Gomez II, 239 S.W.3d at 743 (remanding the case for resentencing because "the record in this case as to the Defendants' criminal histories is not sufficiently well-developed for us to determine the proper sentences based on this enhancement factor alone"). We conclude that consideration of the plain error by the trial court is necessary in this case to do substantial

---

[4] We note that although the Defendant waived his right to a jury trial for a finding of guilt as to his convictions, the record does not reflect that he waived his right to a jury determination as to findings in the application of enhancement and mitigating factors at sentencing. Likewise, the record does not indicate that the Defendant executed a waiver of ex post facto rights that would have allowed the trial court to sentence the Defendant under the Sentencing Act including the 2005 amendments. See State v. Saint, 284 S.W.3d 340, 347 (Tenn. Crim. App. 2008) (holding that the sentencing court was required to apply the sentencing laws in effect at the time of the Defendant's offenses because the Defendant did not waive his ex post facto rights).

justice. Accordingly, we must remand this case for resentencing by the trial court in conformity with Blakely, Cunningham, and Gomez II.[5]

*Consecutive Sentencing*

We need not address the Defendant's final issue regarding consecutive sentencing based upon our decision to remand this case for a new sentencing hearing. Upon remand, however, in determining whether to impose consecutive sentences, the trial court should make findings on the record regarding the relevant factor(s) under Tennessee Code Annotated section 40-35-115(b)(5)(1990) and the facts supporting the application of any relevant factor(s). Additionally, the trial court should make findings on the record regarding the principles of sentencing in determining whether consecutive sentencing is appropriate in this case.

**CONCLUSION**

For the foregoing reasons, we affirm the Defendant's convictions but reverse the Defendant's sentences and remand to the trial court for resentencing consistent with this opinion.

_____
JEFFREY S. BIVINS, JUDGE

---

[5] Because we are remanding the case for resentencing, we need not consider whether the trial court properly determined that mitigating factor (1) did not apply in this case. However, we note that the State, in its appellate brief, conceded that the victim suffered no serious bodily injury but asserts that it was the prerogative of the trial court to afford this mitigating factor no weight. However, the trial court made no such finding. Upon remand, the trial court should address whether it finds that this mitigating factor applies, what weight it gives to each applicable enhancing and mitigating factor, and how it balances those factors.

-14-